## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION**<br>**100 F Street, NE**<br>**Washington, D.C. 20549** | ) ) ) ) ) | |
| **Plaintiff,** | ) ) | **CIVIL ACTION NO.** |
| **v.** | ) ) | **COMPLAINT** |
| **DIEBOLD, INC.**<br>**5995 Mayfair Road**<br>**North Canton, OH 44720** | ) ) ) ) ) | |
| **Defendant.** | ) ) | |

## COMPLAINT

Plaintiff U.S. Securities and Exchange Commission (the "Commission") alleges:

## SUMMARY

1.     This matter concerns violations of the anti-bribery, books and records, and internal control provisions of the Foreign Corrupt Practices Act ("FCPA") by Diebold, Inc. ("Diebold"), an Ohio company that is a global provider of automated teller machines ("ATMs") and bank security systems. From 2005 through 2010, Diebold, through its agents and subsidiaries, lavished international leisure trips, entertainment, and other improper gifts on foreign officials to obtain and retain lucrative business with government owned banks in China and Indonesia. During that same period, Diebold, through its Russian subsidiary, paid bribes in connection with the sale of ATMs to private

banks in Russia.  In all, Diebold made approximately $3 million in illicit payments in China, Russia, and Indonesia.

2.      From 2005 through 2010, through its subsidiary Diebold Financial Equipment Company (China), Ltd. ("Diebold China"), Diebold provided international leisure trips and entertainment to officials of government owned banks in China.  This included trips to Europe, with stays in Paris, Amsterdam, Florence, Rome, and other European cities, and trips to the United States, with travel to the Grand Canyon, Napa Valley, Disneyland, Las Vegas, and other popular tourist destinations.  Diebold spent approximately $ 1.6 million on leisure trips, entertainment, and other improper gifts for government bank officials in China.  During this same time period, through its subsidiary P.T. Diebold Indonesia ("Diebold Indonesia"), Diebold spent over $147,000 on leisure trips and entertainment for officials of government owned banks in Indonesia.  Diebold executives in charge of the company's operations in Asia knew of these improper practices.  The illicit payments were falsely recorded in Diebold's books and records as training or other legitimate business expenses.

3.      From 2005 through 2008, through its subsidiary Diebold Self-Service Ltd. ("Diebold Russia"), Diebold also paid bribes on the sale of ATMs to private banks in Russia.  These bribes, which totaled approximately $1.2 million, were funneled through a Diebold distributor in Russia.  Diebold Russia executed phony service contracts with its distributor to hide and falsely record the payments as legitimate business expenses.

4.      Diebold, through its agents and subsidiaries, violated Section 30A of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78dd-1] by providing

leisure travel and other improper gifts to foreign officials to obtain and retain business with government owned banks in China and Indonesia.  Diebold violated Section 13(b)(2)(B) of the Exchange Act by failing to have internal controls in place to detect and prevent those improper payments, and the improper payments to employees of private banks in Russia.  Diebold violated Section 13(b)(2)(A) of the Exchange Act by falsely recording all of these improper payments as legitimate business expenses in the company's books and records.

## JURISDICTION

5.    This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and78aa].  Diebold, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

6.    Venue is appropriate in this Court under Section 27 of the Exchange Act [15 U.S.C. § 78aa] or 28 U.S.C. § 1391(d).

## DEFENDANT

7.    **Diebold, Inc.** ("Diebold") is an Ohio corporation headquartered in North Canton, Ohio.  Diebold manufactures and sells ATMs and bank security systems. Diebold operates in over 90 countries around the world.  Diebold's common stock is registered with the Commission pursuant to Exchange Act Section 12(b) and is listed on the New York Stock Exchange.

## RELATED INDIVIDUALS AND ENTITIES

8.   **Diebold Financial Equipment Company (China), Ltd**. ("Diebold China") is a subsidiary of Diebold organized and located in China.

9.   **P.T. Diebold Indonesia** ("Diebold Indonesia") is a subsidiary of Diebold organized and located in Indonesia.

10.   **Diebold Self-Service Ltd**. ("Diebold Russia") is a subsidiary of Diebold organized and located in Russia.

11.   **Executive A**, a citizen of Taiwan and a resident of China, is a former Diebold executive.  From January 2010, until his resignation in December 2011, Executive A was Diebold's Executive Vice President for International Operations.  From 2006 through January 2010, Executive A was Diebold's Vice President for the EMEA and Asia Pacific regions.

12.   **Executive B**, a citizen of Taiwan and a resident of China, is a former executive of Diebold Pacific Limited, a subsidiary of Diebold organized and located in Hong Kong.  From January 2010, until his resignation in December 2011, Executive B was Diebold's Vice President for the Asia Pacific region.  From 2006 through January 2010, Executive B was Diebold's Managing Director in China, Hong Kong and Taiwan.

13.   **Distributor A** is a Russian company headquartered in Moscow, Russia. From 2005 through 2010, Distributor A was a distributor of Diebold products in Russia and Ukraine.

14.   **Distributor B** is a Ukrainian company headquartered in Kiev, Ukraine. From 2005 through 2010, Distributor B was a distributor of Diebold products in Ukraine.

## FACTS

### Corrupt Payments in China

15.      Diebold sells ATMs and related services to government owned banks in China.  From at least 2005 through 2010, Diebold, through its subsidiary Diebold China, provided international leisure trips, entertainment, and other improper gifts to foreign officials for the purpose of obtaining and retaining business with government owned banks in China.  These illicit payments totaled approximately $1.6 million.  Examples of international leisure trips that Diebold provided to government bank officials in China are described in paragraphs 16-23.

16.      In 2005, Diebold paid for a fifteen-day leisure trip to the U.S. for two officials from Bank A, a bank owned and controlled by the government of China.  This trip included travel to Universal Studios and Disneyland in Los Angeles, Las Vegas, the Grand Canyon, Washington, DC, New York City, San Francisco, and Hawaii.

17.      In 2006, Diebold paid for a twelve-day trip to Europe for eight officials from Bank B, a bank owned and controlled by the government of China.  This was a leisure and sightseeing trip to Rome, Italy, and Stockholm, Sweden.

18.      Also in 2006, Diebold paid for a two-week leisure trip to Australia and New Zealand for five officials from Bank C, a bank owned and controlled by the government of China.

19.      In 2007, Diebold paid for a two-week trip to France for thirteen Bank A employees. While purportedly for training at Diebold's offices, the primary purpose of the trip was leisure.

20.     In 2008, Diebold paid for a two-week leisure trip to Europe for eight officials of Bank D, a bank owned and controlled by the government of China.  The trip included travel to Paris, Brussels, Amsterdam, Cologne, Frankfurt, Munich, Salzburg, Vienna, Klagenfurt, Venice, Florence, and Rome.

21.     Also in 2008, Diebold paid for a two-week leisure trip to the U.S. for three officials from Bank E, a bank owned and controlled by the government of China.

22.     Also in 2008, Diebold paid for a two-week leisure trip for ten employees of Bank F, a bank owned and controlled by the government of China.  This trip included travel to Hong Kong, Singapore, Malaysia, and Bali.

23.     In 2009, Diebold paid for a two-week trip to the U.S. for twenty-four Bank A employees that included travel to Chicago; to Las Vegas for sightseeing, a dance show, and tour of the Grand Canyon; to Los Angeles for a tour of Universal Studios; to San Diego and San Francisco, which included a tour of Napa Valley.

24.     In addition to the leisure trips and entertainment, Diebold China also provided government bank officials in China with other improper gifts.  This included cash gifts ranging from less than $100 to over $600 that were given to dozens of officials annually.

25.     Many of the government bank employees who received these leisure trips and other improper gifts were senior officials who had the ability to influence purchasing decisions by the banks.

26.     Diebold lacked sufficient internal controls to detect and prevent these illicit payments, many of which were paid to third-parties in China.  All of the illicit

payments were falsely recorded in the company's books and records as training or other legitimate business expenses.

27.     Diebold executives in charge of the company's operations in Asia knew that Diebold China was providing international leisure trips and other improper gifts to Chinese bank officials.  This included Executive A, Diebold's former Executive Vice President for International Operations, and Executive B, Diebold's former Vice President for the Asia Pacific region.  During their tenure at Diebold, Executive A and Executive B knew that Diebold China was providing international leisure trips, entertainment, and other improper gifts to Chinese bank officials.  At times these executives personally approved the illicit payments and accompanied government officials on these trips.  Even after these Diebold executives received FCPA training administered by the company in 2007, they took no action to halt these improper practices.  Instead, these executives took further steps to hide the leisure nature of these trips including, on at least one occasion, providing false information to the company's auditors in China.

28.     Other executives at Diebold were on notice of potential corruption issues at Diebold China.  In 2007, a regional government agency in China, the Chengdu Administration of Industry & Commerce ("CDAIC"), opened an investigation involving, among other issues, leisure trips and gifts Diebold China had provided to bank officials. Company executives in China and the U.S. learned of the investigation after a Diebold field office in Chengdu was raided by authorities.  Executives A and B took the lead in responding to the investigation.  Diebold was able to settle the matter with no corruption charges filed, by paying CDAIC an administrative penalty of 600,000 RMB (approximately $80,000) for business registration violations.  Despite being on notice of

potential corruption issues at Diebold China, Diebold failed to effectively investigate and remediate these problems.

29.     From 2005 through 2010, Diebold generated approximately $265 million in revenues from sales to government owned banks in China whose officials received international leisure travel, entertainment, and other improper gifts by the company.

### Corrupt Payments in Indonesia

30.     Diebold sells ATMs and related products and services to government owned banks in Indonesia.  From 2005 through 2010, through its subsidiary Diebold Indonesia, Diebold provided leisure trips and entertainment to officials of government owned banks in Indonesia.  Diebold Indonesia spent approximately $147,000 on leisure trips and entertainment for officials from three government owned banks in Indonesia: Bank X, Bank Y, and Bank Z.   The purpose of providing these leisure trips was to assist Diebold in obtaining business with these government banks.  For example, in one email exchange in 2009, a Diebold Indonesia employee sought approval from his supervisor to pay for a leisure trip to Europe for officials of Bank X.  The supervisor approved the payment and responded:  "Make this trip successful for upcoming bid too!"

31.     As in China, Diebold lacked effective internal controls to detect and prevent payment for these leisure trips for government bank officials, and the payments were falsely recorded in Diebold's books and records as training costs.  During this time period, Diebold generated approximately $16 million in revenues from sales to government owned banks in Indonesia whose officials were provided leisure trips and entertainment by the company.

8

**False Books and Records in Russia**

32.     During the relevant period, Diebold, through its subsidiary Diebold

Russia, sold ATMs to banks in Russia and Ukraine.  In Russia, the company sold ATMs

both directly, and through independent distributors.  Between 2005 and 2008, Diebold

Russia paid at least $1.2 million in bribes through Distributor A, a private Russian

company, to employees of privately held banks in Russia.  These bribes were funneled

through Distributor A using phony service contracts that Diebold Russia executed with

Distributor A.  Distributor A did not perform any services pursuant to these contracts.

Rather, Distributor A passed along the payments it received under these contracts to

employees of the private banks to which Diebold Russia was selling ATMs.  Diebold

lacked sufficient internal controls to detect and prevent these illicit payments, all of

which were falsely recorded in the company's books and records as legitimate business

expenses.

33.     As early as 2007, Diebold was on notice of corruption issues involving

Diebold Russia's use of distributors in this region.  In 2007, Diebold was seeking to

acquire Distributor B, a Ukrainian company that was an independent distributor of

Diebold products in Ukraine.  During due diligence, executives at Diebold, including

Executive A and certain executives in the company's legal and corporate development

offices learned that Distributor B had previously made illicit payments to employees of

its bank customers.  Diebold was unable to determine whether these illicit payments

involved sales of Diebold products.  While Diebold did not move forward with the

acquisition, without taking any further steps to investigate and remediate these corruption

issues, Diebold continued to do business with Distributor B until 2010.

9

34.     Similarly, in 2009, Diebold was seeking to acquire Distributor A, its largest independent distributor in Russia and Ukraine. During due diligence, evidence emerged that Distributor A potentially had made illicit payments in connection with its business. Diebold continued doing business with Distributor A, and continued moving forward with its planned acquisition. Only later, in 2010, after evidence emerged that Distributor A had also been funneling bribe payments on behalf of Diebold Russia, did the company terminate its business dealings and acquisition plan with Distributor A.

### FIRST CLAIM
### (Anti-Bribery)
### [Violations of Section 30A of the Exchange Act]

35.     Paragraphs 1 through 34 are re-alleged and incorporated by reference.

36.     As described above, Diebold, through its agents and subsidiaries, made use of the mails or means or instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of money, or offer, gift, promise to give, or authorization of the giving of anything of value to any person, while knowing that all or a portion of such money or thing of value would be offered, given, or promised, directly or indirectly, to any foreign official, for the purposes of influencing their acts or decisions in their official capacities, inducing them to do or omit to do acts in violation of their official duties, securing an improper advantage, or inducing such foreign officials to use their influence with a foreign government or instrumentality, to assist Diebold in obtaining or retaining business.

37.     By reason of the foregoing, Diebold violated Section 30A of the Exchange Act [15 U.S.C. § 78dd-1].

**SECOND CLAIM**
**(Books and Records)**
**[Violations of Sections 13(b)(2)(A) of the Exchange Act]**

38.     Paragraphs 1 through 34 are re-alleged and incorporated by reference.

39.     As described above, Diebold failed to make and keep books, records and accounts, which, in reasonable detail, accurately and fairly reflect its transactions and disposition of its assets.

40.     By reason of the foregoing, Diebold violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

**THIRD CLAIM**
**(Internal Controls)**
**[Violations of Sections 13(b)(2)(B) of the Exchange Act]**

41.     Paragraphs 1 through 34 are re-alleged and incorporated by reference.

42.     As described above, Diebold failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were executed in accordance with management's general or specific authorization; and transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for its assets.

43.     By reason of the foregoing, Diebold violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)]

PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final

Judgment:

A.    Permanently enjoining Diebold from violating Sections 30A, 13(b)(2)(A),

and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78dd-1,

78m(b)(2)(A), and 78m(b)(2)(B)];

B.    Ordering Diebold to disgorge all ill-gotten gains wrongfully obtained as a

result of its illegal conduct, plus prejudgment interest; and

C.    Granting such other relief as the Court may deem just and appropriate.

Dated: October 22, 2013

Respectfully submitted,

Scott W. Friestad
Brian O. Quinn (DC Bar No. 450013)
Devon A. Brown

Attorneys for Plaintiff,
Securities and Exchange Commission
100 F Street, NE
Washington, D.C. 20549
 (202) 551-4582 (Brown)